**FILED**

**APR 18 2013**

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS
EAST ST. LOUIS OFFICE

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) ) ) |
| vs. | ) ) Criminal No. 13-30074-DRH |
| ARANTZAZU ATORRASAGASTI, also known as Samantha Roberts, | ) ) Title 18 ) United States Code, Section 1349 |
| Defendant. | ) |

## INDICTMENT

**THE GRAND JURY CHARGES:**

### I. Introductory Statement

1. From in or around 2008 through on or about July 13, 2011, in St. Clair, Madison, Clark, Franklin, Jasper, Massac, and Saline Counties, within the Southern District of Illinois and elsewhere, **ARANTZAZU ATORRASAGASTI,** with others known and unknown, conspired to conduct a telemarketing timeshare resale scheme targeting timeshare owners throughout the United States and Canada.

2. These conspirators, including **ARANTZAZU ATORRASAGASTI**, falsely represented that they had found buyers for the consumers' timeshare interests and solicited fees of up to several thousand dollars from each consumer in purported pre-paid closing costs and related expenses. The purported sales did not occur, closings were not scheduled as was often represented, and, in fact, the conspirators did not successfully sell any consumer's timeshare interest. The conspirators failed to devote substantial resources to marketing their clients' timeshare interest and simply pocketed the purported closing costs, with a substantial portion

1

going to the individual telemarketers like **ARANTZAZU ATORRASAGASTI**, who sold the timeshare resale services to the consumer, and the balance being kept by the owner of the telemarketing company.

3.      Between December 5, 2007 and approximately July 13, 2011, the conspirators collected approximately $6 million and victimized thousands of consumers throughout the United States and Canada. The conspirators victimized at least eight (8) consumers in at least seven (7) of the thirty eight (38) counties comprising the Southern District of Illinois.

## II. The Scheme

4.      The scheme was conducted through various business fronts, including the following:

A.      National Solutions LLC ("National Solutions"), also doing business as Blue Scape Timeshares International, Country Wide Timeshares, Countrywide Timesharesales MA, Landmark Timeshares, Propertys Direct, Quicksale Propertys, Sun Property Networks, Sun Property's, Universal Propertys, and VIM Timeshares, is a Florida limited liability company with its registered address at 11310 S. Orange Blossom Trail, Orlando, Florida, a mail drop, and its principal place of business at 1650 Sand Lake Road, Suite 200, Orlando, Florida.

B.      Landmark Marketing LLC ("Landmark Marketing"), also doing business as Blue Scape Timeshares, Country Wide Timeshares International, Propertys DRK, Quick Sale Advisers, Quick Sale International, and University Propertys International, is a Florida limited liability company with its registered address at 2223 SW 13th Avenue, Miami, Florida, a mail drop, and its principal place of business at 1650 Sand Lake Road, Suite 200, Orlando, Florida.

  C. Red Solutions LLC ("Red Solutions"), also doing business as City Resorts and Resort Advisors, is a Florida limited liability company with its principal place of business at 1650 Sand Lake Road, Suite 200, Orlando, Florida.

  D. Enterprise America, LLC ("Enterprise America"), also doing business as American Timeshares, Exit Week, and Resort Advisors International, is a Florida limited liability company with its registered address at 11310 S. Orange Blossom Trail, Suite 156, Orlando, Florida, a mail drop, and its principal place of business at 1650 Sand Lake Road, Suite 200, Orlando, Florida.

  E. Investments Group of Florida, LLC ("Investments Group"), also doing business as Resort Advisors AM, is a Florida limited liability company with its principal place of business at 1650 Sand Lake Road, Suite 200, Orlando, Florida.

  F. MultiGlobe LLC ("MultiGlobe"), also doing business as Universal Propertys, is a Florida limited liability company with its registered addressed at 1750 Sand Lake Road, Orlando, Florida, and its principal place of business at 1650 Sand Lake Road, Suite 200, Orlando, Florida.

  5. Using these business fronts, **ARANTZAZU ATORRASAGASTI** and other conspirators engaged in a scam intended to deceive consumers into believing that these timeshare resale companies had obtained firm and binding offers from purchasers to buy that consumer's timeshare interest.[1]

  6. **ARANTZAZU ATORRASAGASTI** and other conspirators would contact consumers through unsolicited telemarketing calls. **ARANTZAZU ATORRASAGASTI** and other conspirators would typically target consumers who own timeshare properties that have

---

[1] As used in this indictment, "timeshare" refers to a type of fractional interest in real estate in which the owner has the right to occupy particular premises for a specified period of time. What constitutes a "timeshare" depends upon the law of the state in which the real estate is located.

been listed for sale with timeshare resale companies. In contacting these consumers, **ARANTZAZU ATORRASAGASTI** and other conspirators often already had information about the consumer's timeshare properties, such as the properties' names and locations.

7. Frequently, **ARANTZAZU ATORRASAGASTI** and other conspirators would begin the telemarketing call by representing that she had a buyer for the consumer's timeshare property. In many instances, conspirators would tell the consumer that the purported buyer is willing to pay the consumer's asking price for the timeshare property or, if not the asking price, a price that is likely to be agreeable to the consumer.

8. After representing that she had a buyer for the consumer's timeshare property, **ARANTZAZU ATORRASAGASTI** and other conspirators would confirm that the consumer was interested in proceeding with the sale. **ARANTZAZU ATORRASAGASTI** and other conspirators would then tell consumers that they must pay a fee for the sale to proceed. In many instances, conspirators represented that this fee was required as an "earnest money deposit" to ensure that the consumer committed to sell the timeshare property. In other instances, **ARANTZAZU ATORRASAGASTI** and other conspirators represented that this fee was required to pay for various sale-related expenses, such as closing costs, document processing fees, or title search fees. Regardless of the reason given, **ARANTZAZU ATORRASAGASTI** and other conspirators also represented that the fee would be refunded when the sale of the consumer's timeshare property closed.

9. **ARANTZAZU ATORRASAGASTI** and other conspirators would also frequently tell consumers that the closing of their timeshare property will occur on a specific date, which often was only a few weeks away. To add a sense of urgency, **ARANTZAZU**

ATORRASAGASTI and other conspirators would sometimes represent that the closing was set to occur within a few days so that consumers act quickly in order to proceed with the sale. In some instances, however, **ARANTZAZU ATORRASAGASTI** and other conspirators indicated that consumers would receive a subsequent telephone call with specific information about the closing date.

10. The fee that the conspirators charged consumers for their services typically ranged between $1000 and $3150. Conspirators ordinarily required that consumers use a money order or cashier's check to pay the fee, and that the payment be mailed to conspirators by overnight delivery. Conspirators also at times accepted payment by check draft and credit card.

11. To further induce consumers to pay their fee, **ARANTZAZU ATORRASAGASTI** and other conspirators often represented that the sales transaction must comply with Federal Trade Commission regulations and that the proposed sale of the consumer's timeshare property would be reviewed and approved by the Federal Trade Commission.

12. Believing that conspirators had a buyer for their timeshare property and that conspirators' fee would be refunded at closing, many consumers agreed to proceed with the sale and to pay conspirators' fee. At that point, **ARANTZAZU ATORRASAGASTI** and other conspirators would orally instruct consumers to pay conspirators' fee by obtaining a money order or cashier's check and mailing the payment to conspirators by overnight delivery. Conspirators told consumers that they would receive a contract from conspirators that they should immediately sign and return. Conspirators often referred to this contract as the "sales agreement" or "seller's document."

13. Following the initial conversation, consumers were transferred to, or subsequently received a telephone call from, another of the conspirators' telemarketers for purposes of verifying the consumer's agreement to pay the conspirators' fee. The conspirators recorded portions of these verification calls. In at least one instance, the telemarketer conducting the verification call represented to the consumer that she actually worked for the Federal Trade Commission.

14. Conspirators would then send by mail, email, or facsimile transmission a list of "steps" consumers needed to complete before the sale of their timeshare properties could close. Those "steps" were the same as what many consumers already had been told on the telephone, for example:

> 1. Get a certified check for the amount of $1,500 made out to BLUE SCAPE PROPERTIES. In Memo put (REF#2873HARV)
>
> 2. Fax back a copy of the check to 702-442-5155. ATTN: M.CHANDLER
>
> 3. Overnight the check to:
> Blue Scape Timeshares
> 2961 Industrial Road
> SUITE#610(CLOSING DEPT)
> Las Vegas, NV 89109
>
> 4. GO TO THE POST OFFICE GET A *(sic)* OVERNIGHT EXPRESS TRACKING NUMBER FROM THE POST OFFICE.
>
> 5. PLEASE CALL ME WITH TRACKING NUMBER TO GET YOU VERIFIED

15. In addition to the list of "steps," conspirators also would send consumers a contract that included identifying information about the consumer and the consumer's timeshare property. Below the identifying information, conspirators' contract stated as follows: "TOTAL COST FOR PROCESSING UNTIL YOUR PROPERTY IS SOLD AND/OR RENTED:"

followed by the total amount of the conspirators' fee. Conspirators instructed consumers to sign and return the contract immediately. By the time they received this contract, many consumers already had paid the conspirators' fee by sending the conspirators, by overnight delivery, a money order or cashier's check.

16. The contract consumers received from conspirators did not relate to a pending sale of the consumer's timeshare property, as **ARANTZAZU ATORRASAGASTI** and other conspirators had represented in the telemarketing call. Instead, the contract provided only that conspirators would advertise the consumer's timeshare property for sale or rent. For example, conspirators' contract included the following:

> I understand and acknowledge the following:
> Blue Scape Timeshares is an advertising company. The property owner pays a one-time, non-recurring advertising fee. Our advertising program pools the advertising resources of our customers to get the exposure needed to sell and/or rent your property. Our company forwards all inquiries and offers on your property directly to you, and allows you to negotiate the sales or rentals of your property without the involvement of any real estate brokers, and without the expense of any commission. Our company is not involved in any negotiation for the sale or rental of your property, but we will assist and guide you in the process to the best of our ability. [...] This advertising agreement can be terminated with a written request (we must receive the request within 7 days of sign up, as your advertising begins within the first 48 hours). [...]

17. Upon receiving conspirators' contract, many consumers signed and returned it, mistakenly believing the contract was for the sale of their timeshare property, as **ARANTZAZU ATORRASAGASTI** and other conspirators had represented in the telemarketing call. In numerous other instances, however, consumers realized upon reviewing conspirators' contract that it was only a marketing contract, not a contract for the sale of their timeshare property.

18. Consumers who called **ARANTZAZU ATORRASAGASTI** and other conspirators to question the contract often were told that it was a standardized form contract that

consumers must sign and return to proceed with the sale. These consumers were then often reassured that conspirators' buyer was ready to proceed and that the closing date already had been set. Relying on **ARANTZAZU ATORRASAGASTI** and other conspirators' representations, many consumers then signed and returned the conspirators' contract.

19. After receiving consumers' payments and signed contracts, conspirators often did not contact the consumers again. The promised date for the closing of a consumer's timeshare property typically passed without any further contact from conspirators.

20. **ARANTZAZU ATORRASAGASTI** and other conspirators then employed a series of tactics to stall consumers who attempted to contact them. For example, consumers typically were not permitted to speak to the telemarketer who handled the initial call and were told that the telemarketer is unavailable, out of the office, or busy helping other customers. Requests by consumers for return telephone calls frequently went unanswered. When consumers were able to speak to someone, they often were told that the sale of their timeshare property was proceeding but that a delay had occurred. The reasons given for the delay varied, but typically related to missing paperwork or problems with the buyer's financing. However, the promised sales never closed and consumers did not receive a refund at closing of the fees they already paid to the conspirators.

21. When consumers finally realized they have been deceived and that the conspirators did not actually have a buyer for their timeshare property, many consumers contacted conspirators to complain and demand the return of their money. These complaints usually went unanswered, and consumers' demands for the return of their money were routinely denied or simply ignored. Because consumers often had paid conspirators' fee by money order

or cashier's check, they typically could not reverse or cancel the transaction and get their money back.

22.     The established, proven and highly successful sales pitch that was used by the conspirators contained material misrepresentations of fact and misleading statements to prospective customers, including the following:

    A.     Conspirators have a buyer for the consumer's timeshare property who will pay a specified price;

    B.     Conspirators will refund their fee to the consumer at the closing of a sale of the consumer's timeshare property;

    C.     Conspirators' fees were for deed and title searches, maintenance profiles, deed preparation, title transfer and for similar expenses; and

    D.     Conspirators' proposed sale of the consumer's timeshare property was reviewed and approved by the Federal Trade Commission.

23.     The representations made in the sales pitch used by conspirators were false and fraudulent in that the offers on the consumer's property were a fantasy, the closing dates were totally make believe, and the purported purpose of the fees a pure invention by the telemarketer. The fees were not being used for closing costs, but were being stolen to enrich the conspirators and to pay for continuing expenses associated with the scam.

24.     The sales practices of the conspirators were false and misleading. The business fronts used by the conspirators were permeated with fraud in an industry pervaded by deceit.

25.     In connection with the transactions described in this Indictment, conspirators engaged in a scheme involving deceit and trickery in order to gain an unfair and dishonest

advantage over victims located in the Southern District of Illinois and elsewhere throughout the United States and Canada.

### Count I – Conspiracy
### 18 U.S.C. §1349

26. The previous paragraphs of the indictment are realledged.

27. From in or around 2008 and continuing through on or about July 13, 2011, in the counties of St. Clair, Madison, Clark, Franklin, Jasper, Massac, and Saline, within the Southern District of Illinois and elsewhere,

### ARANTZAZU ATORRASAGASTI

defendant herein, together with others both known and unknown to the grand jury, using various business fronts, did knowingly and willfully combine, conspire, confederate and agree among themselves and with each other to commit certain offenses against the United States, as follows:

A. To devise a scheme and artifice to defraud and to obtain money and property by means of false pretenses, representations and promises, and for the purpose of executing the scheme, and attempting so to do, to knowingly cause to be sent and delivered by the United States Postal Service and by commercial interstate carrier, mail matter to and from residents of the United States, including residents of the Southern District of Illinois, and to and from the offices of conspirators in the State of Florida, in violation of Title 18, United States Code, Section 1341.

B. To devise a scheme and artifice to defraud and to obtain money and property by means of false pretenses, and for the purpose of executing the scheme, and attempting to do so, to knowingly cause to be transmitted by means of wire or radio

10

communication in interstate and foreign commerce, interstate telephone calls, credit card transactions, electronic fund transfers, and signs and signals, to and from the offices of conspirators in the State of Florida, in violation of Title 18, United States Code, Section 1343.

28. In furtherance of and as a foreseeable consequence of the conspiracy, conspirators caused contracts and other documents to be transmitted by U.S. Mail or by interstate commercial carrier to the Southern District of Illinois.

29. In furtherance of and as a foreseeable consequence of the conspiracy, conspirators caused interstate telephone calls to be made to the Southern District of Illinois.

All in violation of Title 18, United States Code, Section 1349.

The offense occurred in connection with the conduct of telemarketing, in violation of the SCAMS Act, punishable under Title 18, United States Code, Section 2326(1).

STEPHEN R. WIGGINTON
United States Attorney

MICHAEL J. QUINLEY
Assistant United States Attorney

Recommended Bond: $100,000 secured